FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO
JUL 09 2020
MITCHELL R. ELFERS
CLERK

Greathouse v Cibola county corrections center et al

CASE # 1:20-CV-00554-KWR-KK

Enclosed in this letter is pages that were attached to Grievance No. 2020-504-003046 from myself (David Greathouse Pretrial Detainee) some how the pages were not attached to the Law suit during Initional fileing of the 1983. The pages are Titled "Declaration of Dr. Jaimi Meyer" "Core civic / Cibola county correctional facility Twon Hall Meeting Record" & "March 30, 2020 VIA Email" All of which is Relevent evidence to the Law suit & complaint

# CoreCivic/CIBOLA COUNTY CORRECTIONAL FACILITY
# TOWN HALL MEETING RECORD

Unit: 100, 200, 300, 400, 500, 600, 700, 800

Time Meeting Started:

Date of Meeting: 5-11-2020

Time Meeting Ended:

**Staff Attending the Meeting:**
Chief of Unit Management: __Woodard__
Unit Manager: Padilla and Sabore
Detention Counselor: Molina, Mendez, Blea, Garcia
Case Manager: Karlovich, Serrano, Phelps, Galindo
Correctional Officer:

**Agenda:**
- ❖ Positive COVID-19

**Subject Covered by Unit Management Team:**
- On May 7th the USMS notified Cibola that the transport from May 4th had contact from a positive COVID-19 detainee. The detainees were tested and tested positive.
    - Transport came from Otero
    - Two female detainees are positive
    - They lived in 200 B the isolation pod upon arrival and have not been in GP
    - They are now housed in medical.
    - No contact with General Population

- Sanitation
    - Masks should be worn when leaving the housing units but is optional for detainees
    - Wash hands for 20 seconds
    - 10:1 bleach needs to be done during the 1100 count and 2200 count.

**Concerns brought up by the inmates:**
1.
2.
3.
4.

Unit Manager: _____  Date: 5-11-20A

Chief of Unit Management: _____  Date: 5/11/20

RECEIVED
MAY 15 2020

Revised 10/16/08

Reference policy-14-1 and 14-100

March 30, 2020

VIA EMAIL

United States Marshal Service
District of New Mexico-Albuquerque

Re: Request of CoreCivic, Inc.

On behalf of CoreCivic, Inc. ("CoreCivic"), I write in response to a request seeking information regarding CoreCivic's plans and procedures to prepare for and prevent the spread of novel coronavirus (COVID-19) among detainees, including those housed at the Cibola County Correctional Center. As a company that has partnered with the U.S. government for more than 30 years, CoreCivic is committed to assisting your inquiry and protecting the health and safety of its employees, the people entrusted to its care at each of its facilities, and the surrounding communities.

As such, in response to the COVID-19 pandemic, CoreCivic has implemented several additional precautionary and preventative actions to diminish its potential impact on the facility, its staff, and the detainees entrusted to its care. Such steps include, recommended actions from the Centers for Disease and Control and the New Mexico Department of Health. In addition to those helpful recommendations, the facility has implemented additional measures based on pragmatic and proactive preventative action, such as, but not limited to;

- Monitoring all persons entering the facility for signs/symptoms associated with COVID-19.

- Sanitizing transportation vehicles

- Instituting social distancing within the facility.

- Broadcasting information regarding enhanced hygiene techniques

- Providing Town Halls to disseminate new schedules and guidance

- Monitoring detainee symptoms, and increasing disinfectant procedures.

- Developing plans and additional precautions to handle staffing shortages should they arise during the COVID-19 pandemic.

In addition to the preventative measures, Cibola County Correctional Center is prepared to manage, any cases of COVID-19. The medical unit at Cibola County Correctional Center includes state-of-the-art equipment and two negative pressure rooms to assist in managing infectious diseases.

Beyond the steps taken at Cibola County Correctional Center. CoreCivic has taken additional company-wide steps with respect to COVID-19, including implementing a Coronavirus Medical Action Plan for each of our facilities; educating facility staff and inmates about the

RECEIVED
MAY 15 2020
Grievance Coordinator

detainees, outside the units is discouraged. Formal programs have been cancelled pending further notice.

18. Is the facility screening all staff, contractors, volunteers and vendors when they enter the facilities including body temperatures? **Yes**

19. Is the facility screening all detainee intakes when they enter the facilities including travel histories and possible confirmed cases of COVID 19 contact? **Yes**

20. Does the facility continue checking body temperatures in the detainee population and have procedures to continue monitoring the populations' health? **Temperatures are taken during sick call and provider appointments. If cohorted or isolated based on suspicion, temperatures will be taken at least 4 times per day.**

21. Does the facility provide education on COVID-19 to staff and detainees that includes symptom education, the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting to seek medical care if they feel ill? **Yes**

22. Has the facility identified housing units for the quarantine of patients who are suspected of or test positive for COVID-19 infection? **Yes**

23. Briefly, what other initiatives have been taken to address COVID 19? **Strict adherence to State Department of Health and CDC directives.**

RECEIVED
MAY 15 2020
Grievance Coordinator

symptoms of the disease and enhanced hygiene practices to prevent its spread; ordering test kits for COVID-19; strengthening the medical intake process to identify those at high risk of being infected with or contracting COVID-19; and planning for staffing (including food service and medical) and housing contingencies if any member of the facility population or staff is diagnosed with COVID-19. CoreCivic has also created a website to communicate information about COVID-19. In order to provide clear information to the families of those individuals who are detained in our facilities, this website lists the facilities where social visitation has been suspended at the request of federal, state, or local partners. A link to the CoreCivic website for COVID-19 is available here: https://www.corecivic.com/en-us/information-on-covid-19.

In addition to carrying out the infectious disease program mandated by the policy and taking numerous actions company-wide, CoreCivic also has implemented the steps recommended by different government partners to address the COVID-19 pandemic. CoreCivic is in frequent communication with its partners to adhere with guidance and institute new procedures to slow the spread of COVID-19. CoreCivic, at its partner's direction, has taken a number of actions to reduce the spread of COVID-19 in facilities including suspending social visitation and instituting increased screening of detainees in line with CDC guidance.

CoreCivic is actively engaged with its federal, state, and local partners, as well as the relevant public health agencies, to monitor the spread of COVID-19 and implement any additional precautionary measures its partners choose to take to combat this disease. We appreciate our conversations with your staff and please do not hesitate to contact us if you have any questions.

Sincerely,

Luis Rosa Jr., Warden

RECEIVED
MAY 15 2020

6. Will the detainee's responses and the results of these assessments dictate whether to monitor or isolate the detainee? **Yes**

    a. Will those detainees who present symptoms compatible with COVID-19 be placed in isolation, where they will be tested? **Yes**

    b. If testing is positive, will they remain isolated and treated? **Yes**

    c. In case of any clinical deterioration, will they be referred to a local hospital? **Yes**

7. In cases of known exposure to a person with confirmed COVID-19, are asymptomatic detainees placed in cohorts? **Yes**

    a. Are detainees diagnosed with any communicable disease who require isolation placed in an appropriate setting in accordance with CDC or state and local health department guidelines? **Yes**

8. What are the facilities medical capabilities?

    a. Does the facility hold male and female detainees? **USMS (M/F)/ICE (MALE)/Cibola County (M/F).**

    b. Do detainees have daily access to sick call in a clinical setting? **Yes**

    c. Does the facility have an infirmary? **No**

    d. Is there access to Specialty Care? **Yes**

    e. Is there access to Hospital Care? **Yes**

9. Is there COVID19 screening, testing, treatment? **Yes, symptom treatment**

10. Please provide COVID 19 data

RECEIVED
MAY 15 2020
Grievance

## Declaration of Dr. Jaimie Meyer

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

I. **Background and Qualifications**

1. I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine. I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2. I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut. In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility. Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. For over a decade, I have been continuously funded by the NIH, industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in closed settings (jails and prisons) and in the community under supervision (probation and parole). I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and others. I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3. I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system including book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system. In making the following statements, I am not commenting on the particular issues posed this case. Rather, I am making general statements about the realities of persons in detention facilities, jails and prisons.

4. My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5. I was paid $1,000 for my time drafting an earlier version of this report filed in another case. I subsequently prepared this version of the report without receiving payment for my services.

1

EXHIBIT B

RECEIVED

MAY 15 2020

Grievance Coordinator

lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

12. <u>Reduced prevention opportunities:</u> During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have access to personal protective equipment, including gloves, masks, gowns, and eye shields. Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak.

13. <u>Increased susceptibility:</u> People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[1] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

14. <u>Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks.</u> Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms. Most jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza). Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

15. <u>Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases.</u> Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases. This includes access to testing equipment, laboratories, and medications.

16. <u>Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care</u> given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

17. <u>Health safety:</u> As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these

---

[1] *Active case finding for communicable diseases in prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

3

RECEIVED
MAY 15 2020
Grievance Coordinator

general public. Antiviral medications are currently in testing but not yet FDA-approved, so only available for compassionate use from the manufacturer. People in prison and jail will likely have even less access to these novel health strategies as they become available.

21. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[5] Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age.[6] Death in COVID-19 infection is usually due to pneumonia and sepsis. The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially when they have not received the influenza vaccine or the pneumonia vaccine.

22. The care of people who are infected with COVID-19 depends on how seriously they are ill.[7] People with mild symptoms may not require hospitalization but may continue to be closely monitored at home. People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen. People with severe symptoms may require ventilation and intravenous antibiotics. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.

23. COVID-19 prevention strategies include containment and mitigation. Containment requires intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment. Jails and prisons are totally under-resourced to meet the demand for any of these strategies. As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces (schools, workplaces, etc.) to protect those most vulnerable to disease. Jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above.

24. The time to act is now. Data from other settings demonstrate what happens when jails and prisons are unprepared for COVID-19. To date, few state or federal prison systems have adequate (or any) pandemic preparedness plans in place. Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and

---

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.
[6] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study.* The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext
[7] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

RECEIVED
MAY 15 2020
Grievance Coordinator

cardiovascular, neurologic, and psychiatric conditions. They described significant delays in receiving medical attention for issues both large and small. Any delays in access to care that already exist in normal circumstances will only become worse during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected.

31. Failure to provide individuals with continuation of the treatment they were receiving in the community, or even just interruption of treatment, for chronic underlying health conditions will result in increased risk of morbidity and mortality related to these chronic conditions.

32. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected.

33. People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention. Failure to provide adequate mental health care, as may happen when health systems in jails and prisons are taxed by COVID-19 outbreaks, may result in poor health outcomes. Moreover, mental health conditions may be exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation.

34. Failure to keep accurate and sufficient medical records will make it more difficult for facilities to identify vulnerable individuals in order to both monitor their health and protect them from infection. Inadequate screening and testing procedures in facilities increase the widespread COVID-19 transmission.

35. Many women at FSL spoke only Spanish and reported significant challenges participating in groups and classes, which were at the time only offered in English. Language barriers will similarly prevent the effective identification of individuals who are particularly vulnerable or may have symptoms of COVID-19. Similarly, the failure to provide necessary aids to individuals who have auditory or visual disabilities could also limit the ability to identify and monitor symptoms of COVID-19.

36. Facilities with a track record of neglecting individuals with acute pain and serious health needs under ordinary circumstances are more likely to be ill-equipped to identify, monitor, and treat a COVID-19 epidemic.

37. Similarly, facilities with a track record of failing to adequately manage single individuals in need of emergency care are more likely to be seriously ill-equipped and under-prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic.

38. For individuals in facilities that have experienced these problems in the past, the experience of an epidemic and the lack of care while effectively trapped can itself be traumatizing, compounding the trauma of incarceration.

7

RECEIVED

MAY 15 2020

Grievance Coordinator

David Greathouse, 06216-151
Cibola County Correctional Center
P.O Box 3540
Milan, NM 87021.US

Legal Mail

ALBUQUERQUE
NM 870
08 JUL '20
PM [Legal Mail]

U.S. POSTAGE >> PITNEY BOWES
ZIP 87021 $ 000.65⁰
02 4W
0000363673 JUL 08 2020

United States District Court
District of New Mexico
Office of The Clerk
Suite 270
333 Lomas Blvd.,
NW, Albuquerque, New Mexico
87102

87102-227470